<u>NOT FOR PUBLICATION</u>

## <u>UNITED STATES DISTRICT COURT</u>
## <u>FOR THE DISTRICT OF NEW JERSEY</u>

_____
                               :

MOISES R. MORY LAMAS,         :
                               :       Civil Action No.
         Petitioner,   :       07-6035 (SDW)
                               :
         v.               :       **O P I N I O N**
                               :
EDWARD MCKENZIE, et al.,    :
                               :
         Respondents.  :
_____:

**APPEARANCES:**

    MOISES R. MORY LAMAS, Petitioner <u>pro se</u>
    Alien No. A 24 552 774, Detention No. 185790
    Hudson County Correctional Center
    Kearny, New Jersey  07032

**<u>Susan D. Wigenton, District Judge</u>**

    On December 13, 2007, Petitioner MOISES R. MORY LAMAS[1]
("Petitioner"), a native of Peru, executed the instant petition for
a Writ of Habeas Corpus ("Petition"), pursuant to 28 U.S.C. § 2241,
challenging his detention by the Department of Homeland Security
("DHS")[2] at Hudson County Correctional Center.

---

[1]

    Petitioner is also known as Moises Roger Mory, or Moises Mory-
Lamas, or Rosario Sebastiani.

[2]

    The Homeland Security Act of 2002, 6 U.S.C. §§ 101-557, P.L.
107-296, 116 Stat. 2135 (Nov. 25, 2002), created the Bureau of
Citizenship and Immigration Services ("BCIS") within the Department

For the reasons set forth below, the Court will dismiss the Petition.

I.   **FACTUAL BACKGROUND**

Petitioner's sixteen-page Petition, heavily laden with legal citations and Petitioner's legal arguments, sporadically intermeshed with factual statements and Petitioner's emotional/philosophical comments, is not a reader-friendly document; and the patchy manner of Petitioner's drafting substantially obstructs understanding of the already-dense factual basis of his claims.   See Docket Entry No. 1.   Petitioner's "letter-brief" ("Brief"), filed on January 8, 2008, in an apparent effort to streamline Petitioner's allegations, is a two-page document that, alas, adds to--rather than resolves--the confusion. See Docket Entry No. 2.   Therefore, in view of Petitioner's extensive litigation history in this District, as well as at the United States Court of Appeals for the Third Circuit, this Court finds it helpful, if not plainly necessary, to start tracing the underlying facts of Petitioner's claim by quoting the

---

of Homeland Security. See 6 U.S.C. § 271(a).   The Act transferred the functions of the Commissioner of the Immigration and Naturalization Service ("INS") to the Director of BCIS, see 6 U.S.C. § 271(b), and abolished INS.   See 6 U.S.C. § 291. Accordingly, DHS replaced INS on March 1, 2003.

determinations made on June 28, 2006, by the Court of Appeals.[3]
Specifically, the Court of Appeals stated that:

> Petitioner, a native and citizen of Peru, overstayed a
> visitor authorization in 1981 and was, thereafter,
> granted voluntary departure until November 7, 1983. He
> remained in the United States, however, and in 1987 pled
> guilty in state court to possession of cocaine.
> Nevertheless, on December 22, 1989, [P]etitioner received
> a grant of advance parole to return to Peru for a short
> visit to his ailing father. On the tenth anniversary of
> that grant of advance parole, [P]etitioner was served
> with a notice to appear in removal proceedings. The
> December 22, 1999 notice alleged that [P]etitioner was
> removable on account of [his] commission of a controlled
> substance offense. An Immigration Judge ("IJ")
> concluded, in a February 9, 2000 order, that [P]etitioner
> was removable because he [self-deported when he traveled
> to Peru on advance parole] and, furthermore, was an alien
> convicted of a controlled substance violation. . . .
> The BIA upheld the determination that [P]etitioner was
> removable on account of the controlled substance
> violation, but disagreed with the IJ that [P]etitioner
> had self-deported in 1989. [Thus,] despite affirming the
> controlled substance basis for removal, the BIA remanded
> the case to permit "a merits hearing on his eligibility
> for cancellation of removal." On remand, the IJ
> addressed [the] eligibility [issue and] issued an order
> granting [P]etitioner cancellation of removal, despite
> the controlled substance offense. On appeal, however,
> the BIA found that [P]etitioner's drug conviction, which
> clearly falls under section 212(a)(2) of the Act,
> rendered him ineligible for cancellation of removal . . .

---

[3]
Rule 201(b), Federal Rules of Evidence, permits a district
court to take judicial notice of facts that are not subject to
reasonable dispute in that they are either: (1) generally known
within the territorial jurisdiction of the trial court, or (2)
capable of accurate and ready determination by resort to sources
whose accuracy cannot reasonably be questioned. Accord Jackson v.
Broad. Music, Inc., 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y.
Jan. 31, 2006) ("the court may take judicial notice of [factual]
admissions in pleadings and other documents in the public record
[including the documents stating facts] that contradict the party's
[subsequent] factual assertions") (quotation marks and citations
omitted).

> . .  That [BIA's finding] was timely challenged [by
> Petitioner in the Court of Appeals for the Third
> Circuit.]  On December 18, 2003, [the Court of Appeals]
> dismissed [that challenge] for lack of jurisdiction in
> light of [P]etitioner's conviction for a controlled
> substance offense.  On August 11, 2004, more than a year
> after the May 2003 final order of removal, [P]etitioner
> filed a motion to reopen.  He sought adjustment of his
> status [on the grounds of his marriage to a United States
> citizen].  On September 20, 2004, the BIA denied the
> motion as untimely and observed that, in any event,
> [P]etitioner had failed to make a <u>prima facie</u> showing
> that he was eligible for adjustment of status.  Shortly
> thereafter, on October 7, 2004, [P]etitioner filed in
> [this] District . . . a petition for a writ of habeas
> corpus pursuant to 28 U.S.C. § 2241 [challenging the
> latest decision by the BIA].  The habeas petition,
> [pursuant to] the REAL ID Act . . . , was converted into
> a petition for review and transferred to [the Court of
> Appeals. The Court of Appeals, again,] held . . . that,
> because of his controlled substance conviction, [it]
> could not exercise jurisdiction over the petition.

<u>Mory-Lamas v. AG of the United States</u> ("<u>Lamas-Appellate</u>"), 2006

U.S. App. LEXIS 16236, at *1-7 (3d Cir. June 28, 2006).[4]  Having

his challenge to the removal order dismissed by the Court of

Appeals, Petitioner sought certiorari from the Supreme Court of the

---

[4]

Apparently, the <u>Lamas-Appellate</u> decision resulted from a transfer order issued by Judge Faith S. Hochberg in <u>Mory-Lamas v. Ashcroft</u>, Civil Case No. 04-4925 (FSH) ("<u>Lamas-District-FSH</u>"). <u>See</u> <u>Lamas-District-FSH</u>, Docket Entry No. 15 (transferring the matter to the Court of Appeals for the Third Circuit, pursuant to the REAL ID Act). It appears that, in "<u>Lamas-District-FSH</u>, Petitioner argued that the Court of Appeals for the Third Circuit erred in its previous finding that Petitioner's controlled-substance-based criminal conviction was a criminal offense within the meaning of the immigration laws. Upon Judge Hochberg's transfer, the Court of Appeals responded to Petitioner's allegation by noting that, in its December of 2003, the Court already "resolved [that] question and [found Petitioner's crime to be a criminal offense within the meaning of the immigration laws, plus] did so correctly."  <u>See</u> <u>Lamas-Appellate</u>, 2006 U.S. App. LEXIS 16236, at *6.

United States, which denied Petitioner's application on May 14, 2007.[5]  See Mory-Lamas v. Gonzales, Docket No. 06-8600, 127 S. Ct. 2247 (2007).

On July 19, 2007, Petitioner filed with this District a § 2241 petition, which: (a) pre-dated the Petition giving rise to the instant matter; and (b) resulted in initiation of an action currently pending in this District before Honorable Dennis M. Cavanaugh, see Lamas v. Gonzales, Civil Action No. 07-3351 (DMC) ("Lamas-District-DMC").

Same as the decision of Judge Hochberg in Lamas-District-FSH, the allegations made by Petitioner in Lamas-District-DMC, as well as the litigation history of that action, are of relevance to this Court's analysis in the instant matter.  As noted supra, Lamas-District-DMC was initiated by Petitioner's filing of § 2241 petition ("Lamas-District-DMC Petition-I"), a document dated July 12, 2007.  In his Lamas-District-DMC Petition-I, Petitioner sought production of a copy of the transcript of one of Petitioner's

_____

[5]

Petitioner initiated his application for certiorari on October 27, 2006, by filing an application for extension of time.  See Mory-Lamas v. Gonzales, Docket Entry No. 06A459, at <<http://www.supremecourtus.gov/docket/06-8600.htm>> (official website of the United States Supreme Court).  Having such extension of time granted on November 3, 2006, and awaiting responsive pleadings, Petitioner filed, on March 26, 2007, an application for release on bail pending disposition of his petition for certiorari.  See id., Docket Entry No. 06A924.  The application for release on bail was denied by Justice Souter forty eight hours after it was filed, i.e., on March 28, 2007.  See id.

hearings, which were apparently held before his IJ.[6]   See Lamas-District-DMC, Docket Entry No. 1.   Petitioner asserted that he needed the transcript because he was: (a) "appealing his immigration case to the Supreme Court of the United States, Case No. 06-8600," even though Petitioner's application for certiorari in the Supreme Court's matter docketed under the number 06-8600 had been conclusively denied two months prior to Petitioner's execution of his Lamas-District-DMC Petition-I;[7] and (b) "preparing other [unspecified] appeals to other [unspecified] courts."  Id. ¶ 16.

On September 5, 2007, Petitioner executed another petition ("Lamas-District-DMC Petition-II") addressed to Judge Cavanaugh.

---

[6]      The content of the Lamas-District-DMC Petition-I does not allow this Court to conclude, with sufficient degree of certainty, which particular IJ's hearing Petitioner had in mind, i.e., the original hearing finding Petitioner removable (but reversed and remanded by the BIA) or the hearing conducted upon that BIA's remand, as a result of which the IJ cancelled Petitioner's removal (the decision that was reversed, apparently without remand, by the BIA).  The Court notes, in passing, the Court's lack of clarity as to the relevance of the transcripts of Petitioner's IJ's hearings, to any undergoing or future proceedings, since both IJ's decisions were expressly reversed by the BIA.  However, this Court need not clarify this matter, either at the instant juncture or at any later point, since the matter is properly before Judge Cavanaugh rather than this Court.

[7]      This Court, of course, cannot exclude the possibility that Petitioner has been seeking a re-hearing of his application for certiorari, and such application for re-hearing has actually been pending before the Supreme Court at the time when--and since--the Lamas-District-DMC Petition-I was executed.  This Court notes, however, that the Court's examination of the Supreme Court's pending docket detected no open matter where Petitioner is a litigant.

See Lamas-District-DMC, Docket Entry No. 2.  That document, titled "Emergency Motion for a Stay of Removal Pending Writ of Habeas Corpus [with respect to the Lamas-District-DMC Petition-I]," asserted that "[w]ithout the stay, the [United States immigration authorities] will remove [Petitioner] before [Judge Cavanaugh] has the opportunity to review the validity of his" request for production of a copy of the transcript sought through the Lamas-District-DMC Petition-I.  Id. ¶ 2.  On September 21, 2007, Judge Cavanaugh issued an order and accompanying opinion which: (a) re-characterized the Lamas-District-DMC Petition-I as a civil rights complaint seeking declaratory relief (in view of the fact that Petitioner's sole claim stated in the Lamas-District-DMC Petition-I was that for production of documents under the Freedom of Information Act); and (b) directed service of the Lamas-District-DMC Petition-I upon the respondents named in Lamas-District-DMC.  See Lamas-District-DMC, Docket Entries Nos. 3, 4.

On September 26, 2007, five days after Judge Cavanaugh's issuance of the aforesaid order and opinion, Petitioner filed with the Clerk an application for appointment of pro bono counsel to represent him in Lamas-District-DMC.  See Docket Entry No. 9.  On the very same day, that is, on September 26, 2007, the Clerk docketed another petition submitted by Petitioner ("Lamas-District-

DMC Petition-III") in the Lamas-District-DMC action.[8]  The Lamas-District-DMC Petition-III, a document largely similar in its content to the Lamas-District-DMC Petition-II and titled identically to the Lamas-District-DMC Petition-II, i.e., "Emergency Motion for a Stay of Removal Pending Writ of Habeas Corpus," re-asserted that the issuance of stay by Judge Cavanaugh was "the only guarantee that Petitioner will remain in the United States" and notified Judge Cavanaugh that Petitioner was preparing appeals (based on unspecified grounds) to the BIA, attacking his removal order, as well as unspecified appeals to the Superior Court of New Jersey, Appellate Division. Id. ¶ 3. Responding to Petitioner's application for appointment of pro bono counsel, Judge Cavanaugh directed such appointment on November 11, 2007, without addressing

---

[8]     Petitioner initiated one more § 2241 action with this District on August 22, 2007, by filing with the Clerk another § 2241 petition, identical in every respect to the Lamas-District-DMC Petition-I. See Lamas v. Gonzales, Civil Action No. 07-4184 (JAG) ("Lamas-District-JAG"), Docket Entry No. 1.  Judge Joseph A. Greenaway, Jr., presiding over the Lamas-District-JAG action, administratively terminated Lamas-District-JAG on the grounds that Lamas-District-JAG was duplicative of Lamas-District-DMC.  See Lamas-District-JAG, Docket Entry No. 2.  In response to Judge Greenaway's administrative termination of Lamas-District-JAG, Petitioner filed, in Lamas-District-JAG, another petition, titled "Emergency Motion for a Stay of Removal Pending Writ of Habeas Corpus." See Lamas-District-JAG, Docket Entry No. 4. Judge Greenaway issued an order directing re-docketing of that "Emergency Motion for a Stay" in Lamas-District-DMC.  See Lamas-District-JAG, Docket Entry No. 5.  As a result of such re-docketing, that "Emergency Motion for a Stay" became the Lamas-District-DMC Petition-III.

Petitioner's "Emergency Motions."[9]  See Docket Entries Nos. 11, 12.
One month later Petitioner executed the Petition, which initiated
the instant action.  See Docket Entry No. 1.

Having summarized the preceding pertinent federal litigations,
the Court now turns to the allegations made by Petitioner in the
instant action, i.e., in his Petition and his Brief.  In his Brief
(filed on January 8, 2008, about one month after Petitioner's
filing of his Petition), Petitioner states the following fact and
supports it by the following legal arguments:

> Petitioner seeks a preliminary injunction preventing
> Respondent[s] from continuing to detain him pending the
> resolution of his post[-]conviction relief in violation
> of his [constitutional] rights of the United States
> Constitution.  It establishes the authority of the
> federal court to release both successful and
> unsucces[s]ful habeas petitioners pending appeal.  See
> Marino v. Vasquez, 812 F.2d 499, 508 (9th Cir. 1987).
> The federal court[s] have the inherent authority to admit
> to bail habeas petitioners being detained by the INS.  See
> Mapp v. Reno, 241 F.3d 221, 224-25 (2d Cir. 2001).[10]

---

[9]

Judge Cavanaugh could not address the issues raised in
Petitioner's "Emergency Motions," i.e., the Lamas-District-DMC
Petition-II and III because, pursuant to the REAL ID Act, Judge
Cavanaugh had no jurisdiction over Petitioner's application for
stay of removal stated in the Lamas-District-DMC Petition-II.
Moreover, he had no reason to consider transfer of the Lamas-
District-DMC Petition-II or III to the Court of Appeals for the
Third Circuit in view of two previous dismissals of Petitioner's
nearly identical applications by the Court of Appeals.  See Lamas-
Appellate, 2006 U.S. App. LEXIS 16236.

[10]

Petitioner's legal arguments are based on cases addressing the
circumstances--and reaching conclusions--wholly inapposite to the
case at bar.  In Marino, a petitioner sought habeas relief in
federal district court after exhausting state court appeals for his
motion for a new trial based on incidents of juror misconduct

Docket Entry No. 2, at 2.

The alleged fact of Petitioner's currently pending application for post-conviction relief: (a) clarified to this Court the nature of litigation to which Petitioner referred in his Lamas-District-DMC Petition-III, submitted to Judge Cavanaugh, when Petitioner asserted that he was "preparing other appeals to other courts"; and (b) signified to this Court that Petitioner, having his order of

---

during the trial in which he was convicted.  After evaluating his application on merits, the district court first granted that petitioner conditional habeas relief and then released him on bail pending the State's appeal of the conditional writ.  The Ninth Circuit held that, under Federal Rule of Appellate Procedure 23, the district court acted within its authority in ordering the petitioner's release on bail in view of the district court's preceding grant of conditional habeas relief.  See Marino, 812 F.2d 499.  Here, by contrast, Petitioner seeks this Court's order releasing him on bail in an immigration matter on the basis of Petitioner's hope to obtain a favorable post-conviction relief from another tribunal in another, i.e., criminal matter.  Thus, Petitioner not only mismatches the courts and the matters within their respective jurisdictions, but also puts the carriage before the horse, making a mockery of the Marino holding.  Petitioner's reliance on Mapp fares no better.  In Mapp, the Second Circuit held that a habeas petitioner could be granted bail by a federal court only if the petitioner demonstrates that his habeas petition raises substantial claims, plus that extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective.  See Mapp, 241 F.3d 221.  Here Petitioner has neither "extraordinary circumstances" nor a meritorious habeas petition pending, nor a situation where a later (hypothetical) habeas relief could be rendered ineffective by lack of current release on bail.  Thus, Mapp is just as inapposite to the case at hand as Marino.  In view of Petitioner's citations to Marino, Mapp, and to a multitude of other inapposite cases, the Court notes, in passing, that: (a) a pro se petitioner is neither required to provide the court with citations to case law or statutory provisions, nor can substitute a statement of his claims with pages of irrelevant legal citations; and (b) a habit for taking lines from legal decisions having no relevance to the case at hand adds nothing to one's pleadings except an aura of untrustworthiness.

removal repeatedly affirmed by the BIA and the Court of Appeals for the Third Circuit on the basis of his criminal conviction, elected to challenge the very fact of that criminal conviction in hope of getting it overturned (which, in the event Petitioner succeeded, could eliminate the basis for affirmation of Petitioner's removal).

However, Petitioner's assertion that he is currently pursuing his post-conviction relief with the Superior Court of New Jersey, Appellate Division, is complicated by the fact that, on June 29, 2006 (about a year and a half prior to Petitioner's execution of his Brief alleging pendency of Petitioner's application for post-conviction relief), the Superior Court of New Jersey, Appellate Division, conclusively dismissed Petitioner's application for post-conviction relief ("PCR"), see State v. Sebastiani a/k/a Moises R. Mory ("Lamas-State"), 2006 WL 1765102 (N.J. Super. App. Div. June 29, 2006), and Petitioner sought no certification from the Supreme Court of New Jersey.  In Lamas-State, the Appellate Division: (a) described the facts underlying Petitioner's conviction and sentence identically to the descriptions provided by Court of Appeals for the Third Circuit in Lamas-Appellate and by Judge Hochberg in Lamas-District-FSH; and (b) defined Petitioner's PCR challenges as follows:

> On June 11, 1987, a judgment of conviction was entered after [Petitioner's] plea of guilty to one count of possession of cocaine . . . . He was sentenced to a term of three years probation . . . on a condition of serving 364 days in the county jail. [Eighteen years later,] on January 12, 2005, [Petitioner] filed a PCR petition,

alleging that the detectives involved in the undercover
operation leading to his arrest did not actually observe
him engaged in a drug transaction. [By the time of
Petitioner's filing of his PCR application, his] sentence
was [long] served and [he] was discharged from probation.
[Since Petitioner] is an illegal immigrant[,] . . . in
1992, his petition for amnesty and legal status was
denied because of his conviction. In 1999, the [INS]
began deportation proceedings against [Petitioner]. . .
. INS arrested [Petitioner] on May 7, 2004, and on
January 12, 2005, he filed the PCR petition. [Denying his
PCR petition], the trial judge [found] that: (1) the
claim [was] time barred; (2) [Petitioner's] sentence was
legal in 1986[,] and [Petitioner] entered into the plea
voluntarily; (3) [Petitioner] knew, as of 1992, that the
conviction was having an effect on his immigration status
and resulted in the denial of his amnesty application;
and (4) [Petitioner's] argument that no one told him
there would be immigration consequences to his guilty
plea was contradicted by his certification indicating
that he was aware that the plea could have consequences
to him.

<u>Lamas-State</u>, 2006 WL 1765102, at *1.

The Appellate Division "affirm[ed] the trial court's denial of

[Petitioner's] PCR petition on the ground that it was filed

substantially out of time [because he could have filed a timely PCR

petition in 1992], but he did not file the PCR petition until

January 12, 2005." <u>Id.</u> at *2. In view of the foregoing, it

appears that Petitioner's statement to this Court that, at the time

of his filing of his Brief, he was appealing the Law Division's

denial of his PCR application to the Superior Court of New Jersey,

Appellate Division, is no more true than Petitioner's statement to

Judge Cavanaugh in <u>Lamas-District-DMC</u> Petition-I that Petitioner

was seeking a certiorari from the Supreme Court of the United

States at the time of his filing of <u>Lamas-District-DMC</u> Petition-I.[11]

Moreover, Plaintiff's allegations in his Brief as to his allegedly undergoing PCR appeal differ from Plaintiff's assertions made in his Petition, a document executed by Petitioner about one month prior to Petitioner's execution of his Brief. Specifically, in his Petition, Petitioner asserts that:

> On September 14, 2007, Petitioner [submitted for filing his] "Notice of Appeal" [with] the Superior Court of New Jersey, Appellate Division, [and the Appellate Division opened a new matter on the basis of such notice under the] Docket Number A-000884-07T4.

Pet. (Docket Entry No. 1), ¶ 19 (citing Pet. Ex. 5).

Exhibit 5, one of many exhibits creating Petitioner's thirty-two page attachment to the Petition, is a Notice of Docketing issued by the Appellate Division. <u>See</u> Docket Entry No. 1-2, at 23. The Notice of Docketing: (a) indicates that Petitioner's appeal was filed on September 24, 2007; and (b) directs service upon respondent named in the matter. <u>See id.</u> The content of the Notice of Docketing suggests that Petitioner's application was of the nature of direct appeal rather than a motion for reconsideration of the Appellate Division's denial of Petitioner's PCR appeal. <u>See</u>

---

[11]

This Court, of course, cannot exclude the possibility that Petitioner has filed a motion for reconsideration with the Superior Court of New Jersey, Appellate Division, and such motion was actually pending before the Appellate Division as of the date of Petitioner's execution of his Brief. The Court, however, takes this opportunity to remind Petitioner of the serious consequences that might result in the event it is actually established that a litigant has been systemically committing fraud on the court. <u>See</u> <u>Herring v. United States</u>, 424 F.3d 384 (3d Cir. 2005).

id.  In other words, it appears that, at the instant juncture, Petitioner has only one undergoing litigation (besides the one at bar) i.e., he is attempting to challenge, through a direct appeal, his 1987 judgment of conviction.  While recognizing that, granted the content of Petitioner's submissions made in the instant case and in all other matters filed in this District, the Court cannot fully harmonize Petitioner's factual assertions, the Court gives Petitioner's Petition the benefit of the doubt and presumes, for the sake of the argument, that Petitioner wished to assert only one undergoing litigation (besides the instant one) i.e., his direct appeal of his twenty-year-old criminal conviction, filed with the Appellate Division on September 24, 2007.[12]  See Estelle v. Gamble, 429 U.S. 97, 106 (1976) (pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers); Haines v. Kerner, 404 U.S. 519, 520 (1972) (same); see also Royce v. Hahn,

---

[12]

The Court notes, in passing, that, as the following discussion demonstrates, the result of this Court's analysis would be identical to the one reached in the instant Opinion in the event Petitioner has been pursuing--at the time of his filing of the instant Petition--either a certiorari with the United States Supreme Court or an appeal of his PCR with the Appellate Division, or both.  Thus, the apparently irreconcilable factual statements in Petitioner's submissions are of no effect on this matter.  However, the Court notes its concern about such discrepancies since, if Petitioner's submissions made with this District contain factual errors that the Court cannot immediately detect, the presence of such undetected alternative facts might affect the Court's analysis.  For instance, in the event Petitioner has actually been granted--rather than merely sought--stay of removal, the Court's review of Petitioner's challenges would be qualitatively different.

151 F.3d 116, 118 (3d Cir. 1998) (a <u>pro se</u> habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989) (same); <u>United States v. Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969) (same), <u>cert. denied</u>, 399 U.S. 912 (1970).

## II.   <u>PETITIONER'S CLAIMS</u>

It appears that Petitioner makes two types of claims in his Petition.  First, he is alleging that his Fifth Amendment rights are being violated by the fact of his detention.  <u>See</u> Docket Entry No. 1, ¶ 29.  This allegation is heavily peppered with case law citations and quotations from various legal decisions, which indicate that Petitioner: (a) challenges his detention because it is "indefinite"; and (b) equates his status with that of a pre-trial detainees or of a defendant who either has been acquitted of the crimes charges or, at the very least, who is not subject to a "final" judgement of conviction.  <u>See</u> <u>id.</u>  The Petition does not elaborate in any way on the basis of Petitioner's allegation as to the indefiniteness of his detention, <u>i.e.</u>, the former aspect of Petitioner's Fifth Amendment challenge.  <u>See</u> <u>generally</u>, Pet. Petitioner, however, vaguely clarifies the latter aspect of his Fifth Amendment challenge, <u>i.e.</u>, he appears to assert that, since he has filed a notice of appeal with the Appellate Division, and the Appellate Division issued a Notice of Docketing, the very fact

that his appeal was docketed and is currently pending before the Appellate Division renders his twenty-year-old conviction non-final and equates him with a pre-trial detainees or an acquitee, or a convict whose judgement is procedurally not final. See id. Petitioner also asserts that the possibility of his success on direct appeal, read against his detention without an individualized bail hearing, renders such detention illegal under the Ex Post Facto Clause because his conviction could be deemed "truly" final only if no single court, state or federal, would ever docket a document containing his challenges related, directly or indirectly, to his conviction. See id. ¶ 30.

The second type of Petitioner's claims: (a) relates to and largely resembles the latter aspect of Petitioner's Fifth Amendment challenge and the spin-off ex post facto claim; and (b) consists of two sub-groups of challenges. See id. ¶¶ 26-28, 31. One of these sub-groups of contentions states that Petitioner had been denied a "meaningful opportunity to demonstrate that he should [be released on bail because the BCIS] does not make decisions concerning aliens custody status in a neutral and impartial manner" as, allegedly, evidenced by the fact that Petitioner is currently in confinement rather than released on bail. See id. ¶ 31. The other sub-group of contentions states that Petitioner is entitled to an individualized bond hearing, pursuant to § 1226(c). See id. ¶ 26. Elaborating on that claim, Petitioner provides an extensive

discussion of inapplicability of exhaustion requirement to the issue of bond hearing,[13] see id. ¶¶ 26-28, and also states that

> Petitioner had asked [Judge Hochberg of the United States District Court for the District of New Jersey, the Court of Appeals for the Third Circuit and the United States Supreme Court] through his lawyers and [as a pro se applicant] to be released [on] bail[] and resolve [Petitioner's challenge] under . . . § 1226(c), [but] he [has] not receive[d] any appropriate response.[14]

Id. ¶ 21.

Concluding his allegations, Petitioner indicates that he seeks the remedy in the form of a writ "directing Respondents to immediately release Petitioner or [to] afford him a bond hearing." Id. at 15.


## JURISDICTION

Under 28 U.S.C. § 2241(c), habeas jurisdiction "shall not extend to a prisoner unless . . . he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A federal court has subject matter

---

[13]

Exhaustion is not a jurisdictional prerequisite, but instead, a matter within the "sound discretion of the court." See Haitian Refugee Center v. Smith, 676 F.2d 1023, 1032 (5th Cir. 1982). Moreover, in this case, because the BIA has already ruled on the issues raised in Petitioner's application, exhaustion would be futile. See Richardson v. Reno, 994 F. Supp. 1466, 1471 (S.D. Fla. 1998), rev'd and vacated on other grounds, 162 F.3d 1338 (11th Cir. 1998), cert. granted, judgment vacated, 526 U.S. 1142 (1999).

[14]

The Petition does not clarify Petitioner's meaning of the term "appropriate response." See generally, Docket Entry No. 1.

jurisdiction under § 2241(c)(3) if two requirements are satisfied: (1) the petitioner is "in custody,"; and (2) the custody could be "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); see also Maleng v. Cook, 490 U.S. 488, 490 (1989). This Court has subject matter jurisdiction over the instant Petition under § 2241 because Petitioner is detained within its jurisdiction and he asserts that his detention is not statutorily authorized and/or violates his constitutional rights.

## STANDARD OF REVIEW

"Habeas corpus petitions must meet heightened pleading requirements." McFarland v. Scott, 512 U.S. 849, 856 (1994). A petition must "specify all the grounds for relief" and set forth "facts supporting each of the grounds thus specified." 28 U.S.C. § 2254 Rule 2(c) (amended Dec. 1, 2004, applicable to § 2241 petitions through Habeas Rule 1(b)).

A court presented with a petition for writ of habeas corpus "shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled there." 28 U.S.C. § 2243. Thus, "[f]ederal courts are authorized to dismiss summarily any habeas petition that appears legally insufficient on its face." McFarland, 512 U.S. at 856; see also United States v. Thomas, 221

F.3d 430, 437 (3d Cir. 2000); Siers v. Ryan, 773 F.2d 37, 45 (3d Cir.), cert. denied, 490 U.S. 1025 (1985).

III. **DISCUSSION**

A. **Detention in Relation to the Final Order of Removal**

Section 1231(a)(1)(A) provides that the government has a 90-day "removal period" to remove an alien ordered removed from the United States.  Detention during the removal period is mandatory[15] and, in addition, § 1231(a) provides that the removal period shall be extended, and the alien may remain in detention during such extended period, if the alien "acts to prevent the alien's removal subject to an order of removal."  8 U.S.C. § 1231(a)(1)(C).

The "removal period" starts on the latest of the following: (1) the date when the order of removal becomes administratively final (that is, appeal to the BIA was either taken and ruled upon, or the time to appeal expired); or (2) if the removal order is judicially reviewed and if a court orders a stay of the removal, the date of the court's final order, or (3) if the alien is detained or confined (except under an immigration process), the date the alien is released from confinement.  See 8 U.S.C. §

---

[15]

Section 1231(a)(2) mandates detention during the removal period. See 8 U.S.C. § 1231(a)(2) ("During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 212(a)(2) or 212(a)(3)(B)").

1231(a)(1)(B).  The obvious rationale of the provision is that the BCIS, having full control and custody over an alien, cannot hold the alien indefinitely while merely hoping to either execute the removal order "eventually" or to have the stay of removal lifted.[16]

If--during the period of removal triggered by the then-latest

---

[16]

While, during the 90-day "removal period," the alien must be detained, see § 1231(a)(2), after the 90-day removal period, the government may but must not further detain the alien.  See id. § 1231(a)(6).  However, in Zadvydas v. Davis, 533 U.S. 678 (2001), the Supreme Court held that aliens may be detained further under § 1231(a)(6) for "a period reasonably necessary to bring about that alien's removal from the United States."  Id. at 689 (holding that "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States [and] does not permit indefinite detention").  Recognizing that its holding would lead to difficult judgment calls in the courts, the Supreme Court, "for the sake of uniform administration in the federal courts" recognized a six-month " presumptively reasonable period of detention."  Id. at 700-01.  However, coining this "presumptively reasonable period of detention," the Supreme Court stressed that,

    [a]fter this 6-month period, o[nly if] the alien provides
    good reason to believe that there is no significant
    likelihood of removal in the reasonably foreseeable
    future, the Government must respond with evidence
    sufficient to rebut that showing.  And for detention to
    remain reasonable, as the period of prior postremoval
    confinement grows, what counts as the "reasonably
    foreseeable future" conversely would have to shrink.
    This 6-month presumption, of course, does not mean that
    every alien not removed must be released after six
    months.  To the contrary, an alien may be held in
    confinement until it has been determined that there is no
    significant likelihood of removal in the reasonably
    foreseeable future.

Id. at 701.

of the three above-listed events applicable to a particular alien--

the alien is subjected to a qualifying superceding event, e.g., the

alien released from confinement related to a criminal offense files

an application seeking judicial review of the alien's removal

order, or if this alien is detained/confined on a new charge or on

parole revocation and then re-released, such superceding event

start the alien's 90-day removal period anew.   See 8 U.S.C. §

1231(a)(1)(B).  As the court explained:

> [There cannot] be ["]only one["] removal period[:] . . .
> that is the only rational reading of the statute. . . .
> [T]he statute provides that the removal period begins on
> the latest of several dates. The passing of one date does
> not stop the operation of the statute. In a sense, the
> only way to apply the statute to a given situation is
> retrospectively. That is, the removal period begins when
> the removal order becomes final. If a court issues a stay
> [or a new detention unrelated to removal proceedings
> takes place], the removal period begins [anew] when the
> stay is lifted [or when such new detention ends].
> Therefore, the only way to determine when the removal
> period begins, or began, is to look at what events
> already have occurred. If there is another potential
> event, there is another potential beginning date for the
> removal period. The only sensible reading of this
> provision is that [DHS/ICE] is required to effectuate the
> removal within 90 days of certain events, but will have
> another 90 days if another one of the designated events
> occurs at a later date. The obvious reason for this is
> that [DHS/ICE] 's authority to effect the removal is
> suspended due to the occurrence of the later event (such
> as a stay order [or a new detention on criminal
> charges]).

Michel v. INS, 119 F. Supp. 2d 485, 498 (M.D. Pa. 2000); accord

Morena v. Gonzales, 2005 U.S. Dist. LEXIS 37989, at *18 (M.D. Pa.

Oct. 4, 2005); Atkinson v. INS, 2002 U.S. Dist. LEXIS 11335, at *5

(E.D. Pa. June 25, 2002); Marcelus v. INS, 2002 U.S. Dist. LEXIS

795, at *6 (E.D. Pa. Jan. 16, 2002); <u>Dunbar v. Holmes</u>, 2000 U.S. Dist. LEXIS 17048, at *6-7 (E.D. Pa. Nov. 28, 2000).


B.   **Petitioner's Current Status and Detention**

    Regardless of Petitioner's efforts to re-characterize his immigration status (as well as the status of his criminal conviction), Petitioner is an alien under a final order of removal, and that final order of removal was entered as a result of a final order of criminal conviction. Pursuant to § 1231(a)(1)(B), Petitioner's order of removal became final when the BIA reversed Petitioner's IJ's cancellation of removal (upon the BIA's finding that Petitioner's drug conviction rendered him ineligible for such cancellation). <u>See</u> 8 U.S.C. § 1231(a)(1)(B). In other words, Petitioner's order of removal has been final since May 28, 2003, <u>see Lamas-District-FSH</u>, Docket Entry 7, Ex. 11, and Petitioner's 90-day removal period (as well as his six-month presumptive period under <u>Zadvydas</u>) began to run on that very same day. Simultaneously, <u>i.e.</u>, as of May 28, 2003, Petitioner's detention became mandatory for the purposes of his 90-day removal period (pursuant to Section 1231(a)(2), since Petitioner  offense was covered by section 212(a)(2), <u>see Lamas-Appellate</u>, 2006 U.S. App. LEXIS 16236, at *3 ("[P]etitioner's drug conviction . . . clearly falls under section 212(a)(2) of the Act")) and--since Petitioner has been "act[ing] to prevent [his] removal"--both his 90-day

removal period and his mandatory § 1231(a)(2) detention, have been tolled for the entire period of Petitioner's non-cooperation with the authorities aiming to remove him from the United States.   See 8 U.S.C. § 1231(a)(1)(C).

> As Judge Hochberg explained to Petitioner,
>
> The INA allows officials to extend the ninety-day removal period "if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's removal subject to an order of removal." . . . 8 U.S.C. § 1231(a)(1)(C). . . . Despite Petitioner's claim that his detention is in violation of <u>Zadvydas</u>, his detention falls outside the scope of <u>Zadvydas</u> because according to his own submissions to the Court, he is the cause of his own incarceration.   The DHS's August 16, 2004 Notice of Failure to Comply states that Petitioner failed to make timely and good faith efforts to obtain travel documents necessary for his removal from the United States.   Specifically, the government alleges the Petitioner has continuously refused to sign the travel documents necessary to allow him to be repatriated to Peru. The government's claim is confirmed by Petitioner's own motion papers . . . .

<u>Lamas-District-FSH</u>, Docket Entry No. 15, at 4.

Thus, as Judge Hochberg already explained to Petitioner, his detention is not "indefinite" as a result of any misapplication of legal provision by the BCIS: the detention has been protracted merely because "he is the cause of his own incarceration."   In other words, because of Petitioner's continuous and zealous efforts to thwart all government attempts to remove him, as well as Petitioner's persistent refusal in executing the papers necessary to secure his travel documents to Peru, Petitioner's 90-day removal period, as well as the accompanying mandatory detention, is just as

tolled as of the date of this Opinion as it was at the date of
Judge Hochberg's or, for what it matters, as of the day when
Petitioner's order of removal just became final and Petitioner
launched his campaign of obstruction of removal.[17]   See <u>Lamas-
Appellate</u>, 2006 U.S. App. LEXIS 16236, at *5 .3 (noting that, in
his petition submitted in <u>Lamas-District-FSH</u>, "Petitioner . . .
challenged his continued custody by immigration officials [while]
conce[ding] that he '. . . refused to cooperate with the government
with respect to his travel document' and that 'he [was] willing to
remain incarcerated rather than leave the United States'"); <u>see
also Woman Claims Detainees Must Stand Naked in Tiffin Jail</u>, Toledo
Blade (Ohio), at 2 (Nov. 2, 2006) (stating that Petitioner's wife
gave an interview to "El Conquistador," a weekly Spanish newspaper,
asserting that Petitioner's civil rights were violated because,
while he was in the Seneca County jail, he was forced by the
immigration officials to stand naked as a result of their, although
unsuccessful, attempts to make him sign application for travel
documents to Peru); <<http://lawprofessors.typepad.com/immigration
/2007/08/hazleton-files-.html>> ("The U.S. Immigration and Customs

---

[17]

  Petitioner prepared pleadings alleging that the Court of
Appeals for the Third Circuit, as well as Judge Hochberg, failed to
provide him with an "appropriate response."  However, a review of
Judge Hochberg's Opinion and Order, especially in conjunction with
the Court of Appeals decision in <u>Lamas-Appellate</u>, answers
Petitioner's question as to why his detention was mandatory under
§ 1231(a)(2), as well as why the pre-removal-order-detention
statute, § 1226(c), is inapplicable to Petitioner's circumstances.

Enforcement has attempted to deport [Petitioner] various times, but he has managed to file [numerous legal actions] and keep them open in order to [keep delaying] his deportation. [Petitioner's] determination to stay in the U.S. has even defied the American Civil Liberties Union . . . and the League of United Latin American Citizens . . . inability to provide legal services in [his] case"). Indeed, while Petitioner elected to shower this Court with factual allegations, legal citations and legal arguments, his entire sixteen-page Petition, as well as his thirty-two page attachment to the Petition, is completely void of any allegations asserting Petitioner's cooperation with the authorities aiming to remove him from the United States.  Since Petitioner does not even allege that he has been cooperating with the immigration authorities seeking his removal (and, thus, for finding that Petitioner's 90-day removal period stopped being tolled and his detention stopped being a mandatory one), Petitioner's incarceration and mandatory "non-bailable" detention are legally proper.

Moreover, while Petitioner appears to be under the impression that any filing/docketing of his appeal with any court in the United States automatically wipes out his existing order of removal and transforms him into a pre-removal-order detainees, Petitioner errs.  Only if his removal order has been judicially reviewed and, in addition, the court performing such review has ordered a stay of his removal, that stay order could become the "new" final order of

removal superseding the currently operable May 28, 2003, order of removal the purposes of 8 U.S.C. § 1231(a)(1)(B). Hence, while Petitioner appears to believe that he has been protected from removal by the legal challenges he has been filing, in reality, he has been spared from removal because of his persistent refusal to cooperate with the immigration authorities seeking to secure his travel documents; but this very same persistent refusal to cooperate has been keeping Petitioner in mandatory detention not amenable to bond hearings.[18]

It follows that the fact of Petitioner's application for certiorari to the United States Supreme Court could not have been of relevance to his current detention, unless the Supreme Court actually granted Petitioner stay of removal. However, it did not; rather, it denied him certiorari, see Mory-Lamas v. Gonzales, 127 S. Ct. 2247, leaving: (a) the decision of the Court of Appeals for the Third Circuit valid law; and (b) Petitioner's final order of removal, entered on May 28, 2003, unaffected. A fortuori, Petitioner's applications to the Superior Court of New Jersey,

---

[18]

Indeed, had it been otherwise, the immigration regime would yield an anomalous scenario where an alien would be rewarded by release from confinement for his obstruction of government efforts or for his abuse of legal process. Accord Kavalev v. Ashcroft, 71 Fed. App. 919, 924 (3d Cir. 2003); Pelich v. INS, 329 F.3d 1057, 1060 (9th Cir. 2003) ("[the temporal limitations associated with removal period do] not save an alien who fails to provide requested documentation to effectuate his removal. The reason is self-evident: the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock").

either to the Law Division or to the Appellate Division, challenging Petitioner's criminal conviction are of no relevance whatsoever, since these state courts do not even have the jurisdiction to issue a stay of Petitioner's removal and, thus, cannot affect, in any way, Petitioner's 90-day removal period and accompanying mandatory detention.[19]

Petitioner's triangulated argument against finality of his order of removal (based on his allegation that his criminal conviction has not been finalized) is erroneous. It appears that Petitioner attempts to reason as follows: (1) Petitioner, eventually, might be able to succeed on his direct-appeal challenge to his criminal conviction currently pending with the Appellate

---

[19]

The INA defines "conviction," in relevant part, to mean, "with respect to an alien, a formal judgment of guilt of the alien entered by a court." 8 U.S.C. § 1101(a)(48)(A). A conviction must attain finality before it can support a final order of removal under the INA. See Pino v. Landon, 349 U.S. 901 (1955) (per curiam). While the determination of finality is a matter of federal immigration law, see Will v. Immigration and Naturalization Service, 447 F.2d 529, 531 (7th Cir. 1971), immigration authorities must necessarily look to state judicial records to determine whether an alien has been "convicted" of a state crime, see Alleyne v. United States Immigration and Naturalization Service, 879 F.2d 1177, 1183-84 (3d Cir. 1989). Federal courts have uniformly held that an alien has not been "convicted" of a crime for immigration purposes "until a judgment of conviction has been entered and until procedures for a direct appeal have been exhausted or waived." Aguilera-Enriquez v. Immigration and Naturalization Service, 516 F.2d 565, 570 (6th Cir. 1975); accord Morales-Alvarado v. Immigration and Naturalization Service, 655 F.2d 172, 175 (9th Cir. 1981); Marino v. Immigration & Naturalization Service, 537 F.2d 686, 691-92 (2nd Cir. 1976); Will, 447 F.2d at 533. The BIA also endorses this principle. See, e.g., Matter of Onyido, 22 I. & N. Dec. 552 (BIA 1999).

Division; (2) if Petitioner succeeds on that direct appeal, his criminal conviction would eventually be reversed, hence eliminating the basis for his order of removal; (3) if Petitioner eventually succeeds in eliminating the basis for his current order of removal, his removal order could eventually be reversed, hence eliminating the basis for his detention; therefore, Petitioner's order of removal should not be deemed "final" until Petitioner is precluded from filing any challenge to his judgment of criminal conviction (i.e., he should be considered a "potential acquitee" or, at least, a pre-trial detainee). See Pet. ¶¶ 20-26.

Leaving aside the obvious observation that a legal "adjudication cannot rest on any such 'house that Jack built' foundation," Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 731 (1973), a careful reading of Petitioner's triangulated argument indicates that Petitioner conflates two qualitatively different concepts, i.e., an order of removal (and accompanying immigration detention) and a judgment of conviction (and accompanying criminal incarceration). Since finality of an order of removal is governed by § 1231, a provision that has nothing to do with finality of criminal convictions, the sole reasonable construction of Petitioner's triangulated argument that this Court may afford to Petitioner is that Petitioner is challenging the very existence of his order of removal, i.e., he is asserting that his removal order should be deem void ab initio, as

premature, because it was entered on the basis of judgement of conviction that, according to Petitioner, cannot be yet deemed final.[20]  If so, Plaintiff's triangulated argument is not properly

---

[20]
    The Court notes, in dicta, that this allegation is wholly without merit. See, e.g., Okabe, 671 F.2d at 865 ("post-conviction motions do not operate to negate the finality of a conviction for deportation purposes, unless and until the conviction is overturned pursuant to such motions").  A state-court criminal judgment becomes "final" by the conclusion of direct review or by the expiration of time for seeking such review, including the 90-day period for filing a petition for writ of certiorari in the United States Supreme Court. See Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir. 1999); U.S. Sup. Ct. R. 13. "If a defendant does not pursue a timely direct appeal to the court of appeals, his or her conviction and sentence become final . . . on the date on which the time for filing such an appeal expired." Kapral v. United States, 166 F.3d 565, 577 (3d Cir. 1999).  Since Petitioner's judgement of conviction was entered on June 11, 1987, Petitioner's conviction became "final" at the time when Petitioner's period to appeal his conviction to the Appellate Division expired, i.e., in 1987, about twenty years prior to Petitioner's filing of his currently pending direct appeal to the Appellate Division, and Petitioner's self-re-qualification into a pre-trial detainee or "potential acquitee" is either legally or factually unwarranted, same as his "ex post facto" argument.
    Petitioner challenges the aforesaid traditional concept of finality of criminal convictions by asserting that "[i]t is well established that a conviction does not attain a sufficient degree of finality for immigration purposes until appellate review of the conviction has been exhausted or waived" and by citing Made v. Ashcroft, 2001 U.S. Dist. LEXIS 25611 (D.N.J. May 31, 2001).  There are, however, two problems with Petitioner's challenge/citation. First, Petitioner's "challenge" (being a statement made by the Court of Appeals for the Sixth Circuit in Aquilera-Enriquez, 516 F.2d at 570) affirms, rather than contradicts the aforesaid traditional concept of finality of criminal convictions: Petitioner's own statement verifies that his conviction has long been final because he waived his right to appellate review when, in 1987, he allowed his appellate period to expire.  Second, no statement even remotely resembling Petitioner's "challenge" was made by the Made court.  In Made, a 21-year-old lawful permanent ("LPR") resident pleaded guilty to a charge of endangering the welfare of a child based on his sexual relationship with his then-

before this Court.  Any challenge to an order of removal must be presented by petition for review with the appropriate Circuit Court of Appeals, pursuant to Section 106(a)(5) of the REAL ID Act of 2005.[21]  "Under the new judicial review regime imposed by the REAL ID Act, a petition for review is now the sole and exclusive means of judicial review for all orders of removal except those issued pursuant to 8 U.S.C. § 1225(b)(1)."  Bonhometre v. Gonzales, 414

_____

15-year-old girlfriend.  After the relationship resulted in the birth of a child, and the girlfriend and child moved to the Dominican Republic, the LPR took a two-week trip to the Dominican Republic but, upon his return to the United States, was taken into custody and charged with being an alien seeking admission (because he had been convicted of a crime).  While the INS argued that the LPR's status of an alien seeking admission was undisputably proper under the Immigration and Nationality Act, the court disagreed finding that the record was insufficient to determine whether the LPR's trip rendered him an alien seeking admission.  See id.  The issue of the LPR's criminal conviction, or the finality of that conviction, was neither challenged by the LPR or addressed by the Made Court.  Thus, Made is wholly inapposite to the case at bar, both factually and legally.  In view of Petitioner's (hopefully, innocent) distortion of the Made precedent, the Court reminds Petitioner, one more time, that--while a pro se applicant is neither expected nor required to provide the court with legal citations or arguments--inclusion of distorted legal precedent reduces the applicant's credibility.

[21]  Section 106(a)(5) of the REAL ID Act of 2005 reads:

Notwithstanding any other provision of law (statutory or non-statutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this Act, except as provided in subsection (e) [relating to orders issued under 8 U.S.C. § 1225(b)(1)].

F.3d 442, 445 (3d Cir. 2005); see also 8 U.S.C. § 1252(a)(5) (1999 & Suppl. 2005).  The circuit courts' jurisdiction was also enlarged to include consideration of constitutional claims or questions of law raised in a criminal alien's petition for review.  See 8 U.S.C. § 1252(a)(2)(D) (2005).  Since this Court is divested of subject matter jurisdiction to issue any decision as to Petitioner's challenge to his removal order, Petitioner's triangulated argument has to be dismissed.  Moreover, in view of the Court of Appeal's decision in Lamas-Appellate and Petitioner's apparent error as to the issue of finality of criminal conviction (and being mindful of the Appellate Division's denial of Petitioner's PCR application as time-barred because it was "only" thirteen years overdue),[22] this Court finds that transfer of the instant Petition to the Court of Appeals is not in the interests of justice.

In sum, the Court finds that Petitioner, being an alien subject to final order of removal, is currently in his "still-being-tolled" 90-day removal period and, consequently, is properly in mandatory detention without bail, pursuant to 8 U.S.C. §

---

[22]

    Petitioner's currently pending direct appeal is twenty years overdue.  The Court, however, notes that no statement made in this Opinion shall be interpreted as this Court's conclusion that the Appellate Division cannot choose to entertain Petitioner's direct appeal (since, indeed, it may address Petitioner's appeal on merits through the application of the equitable tolling doctrine), same as this Court enters no opinion as to whether or not the Appellate Division may or may not reverse Petitioner's conviction.

1231(a)(2).[23]  Petitioner's challenges based on § 1226(c) or the Ex Post Facto Clause are without merit, since Petitioner's circumstances do not provide factual basis for such challenges. Petitioner's challenges to finality of his criminal conviction are of no relevance to his challenge with respect to his detention as an alien under the final order of removal and, if interpreted as Petitioner's challenges to his order of removal, are outside of this Court's jurisdiction.

The Court, therefore, will deny the Petition.


## CONCLUSION

For the foregoing reasons, Petitioner's Petition will be denied.

Such denial will be without prejudice to Petitioner's filing another § 2241 petition should Petitioner, *after cooperating, in good faith, with the immigration authorities seeking to secure his travel documents to Peru*, is still being detained for the period exceeding six months *and*, *in addition*, Petitioner develops *good*

---

[23]    In view of Petitioner's allegations that lack of his release on bail indicates bias on the part of the immigration officials, this Court notes that, while Petitioner might be dissatisfied with lack of bond hearing ensuing from the mandatory detention regime of 8 U.S.C. § 1231(a)(2), the sole fact of Petitioner's dissatisfaction cannot indicate that his Due Process rights were violated. Cf. Coades v. Kane, 1992 U.S. Dist. LEXIS 8844 (E.D. Pa. May 22, 1992) (an inmate was not denied due process merely as because an unfavorable decision was reached, since an unfavorable decision per se is not the same as a denial of due process).

*evidence* that his removal is not reasonably foreseeable.[24]

An appropriate Order accompanies this Opinion.


_____**s/SUSAN D. WIGENTON**
                                        **United States District Judge**
Dated: February 6, 2008


_____

[24]

Since it appears that (because of his own misconceptions or, perhaps, acting upon advice of someone having either poor understanding of law or not Petitioner's best interests at heart) Petitioner believes that his flooding of the courts with speculative, meritless or otherwise invalid legal challenges is, somehow, the strategy ensuring a successful outcome, this Court-- gravely concerned about the consequences of such strategy--takes this opportunity to remind Petitioner about the concept of "abuse of writ." The concept differs from that of "successive petition." A "successive petition" raises grounds identical to those raised and rejected on the merits on a prior petition. See Sanders v. United States, 373 U.S. 1 at 15-17 (1963). By contrast, "[t]he concept of 'abuse of the writ' is founded on the equitable nature of habeas corpus. . . . Where a prisoner files a petition raising grounds that were available but not relied upon in a prior petition, or engages in other conduct that disentitles him to the relief he seeks, the federal court may dismiss the subsequent petition on the ground that the prisoner has abused the writ." Id. at 17-19. This Court, therefore, strongly encourages Petitioner to consider each his application, be it filed with this District or with any other state or federal court, with utmost care and seriousness and to avoid recreational/meritless litigation.